In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3535

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CARLTON MCINTOSH,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 CR 556—**James B. Zagel,** *Judge.*

ARGUED SEPTEMBER 28, 2012—DECIDED DECEMBER 12, 2012

Before POSNER, ROVNER and SYKES, *Circuit Judges.*

ROVNER, *Circuit Judge.* At the conclusion of a bench trial, the district court found Carlton McIntosh guilty of one count of failure to surrender for service of a prison sentence, in violation of 18 U.S.C. § 3146. The court sentenced McIntosh to a term of sixty months' imprisonment to be followed by a term of supervised release of thirty-six months. McIntosh appeals both his conviction and his sentence. We affirm.

## I.

Carlton McIntosh has managed to stretch a one-year sentence for bank fraud into an eighteen-year lawless odyssey that appears nowhere near over. Each time he is imprisoned or serving a term of supervised release, he either violates the conditions of his release or commits an entirely new crime. We describe here the most direct path from that early bank fraud sentence to McIntosh's circumstances today, with the *caveat* that even this lengthy, convoluted trek through the justice system does not include all of McIntosh's criminal exploits.

In 1994, McIntosh pled guilty to one count of bank fraud and was sentenced to twelve months' imprisonment to be followed by three years of supervised release. *United States v. McIntosh*, 1996 WL 117614 (8th Cir. Mar. 19, 1996) ("*McIntosh I*"). He completed the term of imprisonment but during his supervised release, he committed bank fraud again and violated the conditions of his release in other, more minor ways. The court revoked his release and sentenced him to thirty-six months' imprisonment for these violations. *See McIntosh I*, 1996 WL 117614, at *1.

While he was serving that thirty-six month term, federal officials released McIntosh from a federal prison in Duluth, Minnesota to the custody of the State of Illinois, to face charges for forgery. *United States v. McIntosh*, 198 F.3d 995, 997-98 (7th Cir. 2000) ("*McIntosh II*"). McIntosh pled guilty to the Illinois state charge and was sentenced to time served. He was then inadvertently released from state custody without being returned to federal

custody. When he failed to surrender to federal authorities, he was charged with escape in Minnesota. While he was evading arrest for escape, McIntosh opened three bank accounts in Wisconsin into which he deposited bad checks. He then managed to withdraw money from these accounts, and used some of the funds to purchase a BMW that he was driving when he was later apprehended in Indiana. Based on these incidents, the government charged McIntosh with bank fraud and money laundering in the Southern District of Indiana in April 1997. Eventually, the Minnesota escape charge was dismissed and the government decided to charge McIntosh in Indiana simply with bank fraud. Plea negotiations followed and when they broke down ten months later, a grand jury returned an indictment charging McIntosh with one count of money laundering. The government moved to dismiss the bank fraud charge. *McIntosh II*, 198 F.3d at 997-98. McIntosh eventually pled guilty to the money laundering charge and was sentenced to seventy-eight months' imprisonment to be followed by thirty-six months of supervised release. *McIntosh II*, 198 F.3d at 999.

In September 2003, McIntosh escaped from a halfway house where he was completing the seventy-eight month sentence for money laundering. *See United States v. McIntosh*, 2006 WL 1158897 (7th Cir. May 3, 2006) ("*McIntosh III*"). He was attempting to open yet another fraudulent bank account when authorities apprehended him. He subsequently was convicted of one count of escape, in violation of 18 U.S.C. § 751(a), and he was sentenced to forty-

one months' imprisonment to be followed by a three-year period of supervised release. *See United States v. McIntosh*, 630 F.3d 699, 700-01 (7th Cir.), *cert. denied*, 131 S. Ct. 2128 (2011) ("*McIntosh IV*").

After completing the term of imprisonment for the escape conviction, McIntosh began the period of supervised release in September 2006. As the reader may have guessed by now, it did not go well. By May 2007, the district court found that McIntosh had violated the conditions of his release in four ways: he had committed a crime, he had failed to report to his probation officer, he had failed to obtain lawful work, and he had left the judicial district without permission. *McIntosh IV*, 630 F.3d at 701. The court therefore revoked his supervised release and sentenced him to an additional fourteen months' imprisonment to be followed by a term of supervised release of twenty-two months.

He completed the additional term of imprisonment and began the second term of supervised release in June 2008. By August 2009, McIntosh was back in court. This time the court found that he had violated the conditions of release by using false identification documents to open bank accounts and fraudulently obtain money, by failing to pay restitution, and by failing to comply with the reporting requirements for supervised release. The government also presented evidence that McIntosh had fraudulently obtained tax refunds in the names of several persons he met in prison, that he had failed to report to his probation officer an arrest for the theft of a rental car, and that he had again left the jurisdiction without permission.

On November 25, 2009, the court revoked his supervised release and sentenced him to an additional sixteen months of imprisonment to be followed by a term of supervised release of twelve months (which the court later shortened to six months). *McIntosh IV*, 630 F.3d at 701-02. In court, the judge told McIntosh that he was required to surrender to the U.S. Marshals on January 8, 2010. The court also told McIntosh that he remained on supervised release under the same conditions as before until he surrendered. The court's November 25, 2009 Order specified, "Defendant to surrender on 1/8/2010 at noon to U.S. Marshals Service." R. 131.[1] McIntosh's probation officer told him that the office for the U.S. Marshals Service was on the 24th floor of the same building as the courtroom.

On December 16, 2009, McIntosh filed a "Motion to Allow Surrender and for Recommendation." R. 140. In that motion, McIntosh sought to have the district court recommend to the Bureau of Prisons ("BOP") that he be allowed to serve his sentence close to home, in one of three requested federal facilities in Illinois and Indiana. He also wished to surrender directly to the selected institution rather than to the Marshals Service. McIntosh was present for the December 21, 2009 hearing on the motion, which the court granted. The court entered an order stating:

---

[1] All references to the Record are to the underlying escape conviction and revocation proceedings in that matter, Case No. 03 CR 991-1, in the Northern District of Illinois.

> Motion hearing held. Motion to allow surrender and for recommendation [140] granted. The Court recommends that the Defendant be allowed to serve his time at Pekin, or Greenville, Illinois, or in Terre Haute, Indiana. Defendant McIntosh is granted to surrender directed [sic] to the designated institution.

R. 144. On January 5, 2010, three days before the surrender date, McIntosh filed a Motion to Stay Surrender. R. 150. McIntosh disputed the court's legal authority to sentence him to an additional sixteen months of imprisonment and took the position that the court could sentence him to no more than five additional months. Because he would likely serve more than five months before the issue could be resolved on appeal, he sought to stay his surrender.[2] After a January 7, 2010 hearing on the matter, the court denied McIntosh's motion for a stay. R. 153. McIntosh was not present at that hearing.

On the next day, January 8, 2010, he did not surrender. The BOP had not designated a particular institution to which McIntosh should report. Perhaps McIntosh thought he had discovered the grandmother of all loopholes: the court had granted his request to surrender to a particular institution; the BOP had yet to designate the prison; therefore he did not have to surrender. The fact that the court had denied his Motion to Stay Surrender a scant twenty-four hours earlier apparently escaped his attention. But it could not have escaped his attention for long.

---

[2] That appeal was resolved against him. *See McIntosh IV*, 630 F.3d at 702-04.

The district court issued a bench warrant for McIntosh's arrest, and he soon became aware that U.S. Marshals were looking for him. He spoke with a clerk in the district court's chambers on January 29, 2010, and the clerk informed him of the arrest warrant and the need to surrender immediately. Subsequently, a Deputy U.S. Marshal reached McIntosh by phone, and McIntosh told the deputy that he had spoken to the district court judge and intended to turn himself in. A second Deputy U.S. Marshal spoke to McIntosh that same day and specifically told him to surrender to the Marshals in the lobby of the federal courthouse at 8:30 a.m. the following business day. Although he agreed to do so, McIntosh never showed up. Instead, after speaking to the clerk and the Deputy U.S. Marshal (and to his attorney, who also told him that the January 8, 2010 surrender date was intact), McIntosh rented a car and drove to Nashville, Tennessee, leaving the jurisdiction without permission and once again violating the conditions of his supervised release. He also failed to return the rental car on January 31, 2010 as he had agreed to do. McIntosh remained in Nashville until his arrest on February 3, 2010.

McIntosh later offered a few different reasons for his failure to surrender. First, he told a Secret Service agent that, although he had been ordered to surrender to the U.S. Marshals, he decided not to do so because he wanted to continue working on an appeal for his supervised release revocation and had not yet completed it. He also told the Secret Service agent that the court's order allowing him to self-surrender did not have a date

on it, and that when he heard the Marshals were looking for him, he called the judge's office and was told to surrender immediately to the Marshals. After that conversation with the judge's staff, he packed his car and left Chicago instead of reporting to the Marshals. Later, at trial, he claimed that he failed to surrender because he was waiting for a letter from the BOP designating a particular institution. After a bench trial at which McIntosh testified on his own behalf, the district court found McIntosh guilty of failing to surrender for service of a prison sentence, in violation of 18 U.S.C. § 3146. The court sentenced him to sixty months' imprisonment to be followed by thirty-six months of supervised release. McIntosh appeals.

## II.

On appeal, McIntosh contends that the evidence was insufficient to prove that his failure to surrender was wilful. He also claims that inconsistent testimony by government witnesses deprived him of the right to due process.[3] Finally, he contests his sentence. We will overturn

---

[3] McIntosh's argument that false testimony by government witnesses violated his right to due process is unsupported by the facts and by any citation to legal authority. Our review of the testimony reveals only slight (and insignificant) differences in the government witnesses' descriptions of the interior of McIntosh's home in late January 2010. And contrary to his claim, the state of McIntosh's home was not the govern-
(continued...)

a verdict for insufficiency of the evidence only if, after viewing the evidence in the light most favorable to the government, the record is devoid of evidence from which a rational trier of fact could find guilt beyond a reasonable doubt. *United States v. Vaughn*, 585 F.3d 1024, 1028 (7th Cir. 2009), *cert. denied*, 130 S. Ct. 3385 (2010); *United States v. Olson*, 450 F.3d 655, 664 (7th Cir. 2006).

## A.

Section 3146(a)(2) provides that "[w]hoever, having been released under this chapter knowingly . . . fails to surrender for service of sentence pursuant to a court order shall be punished as provided in subsection (b) of this section." 18 U.S.C. § 3146(a)(2). In order to demonstrate a violation of Section 3146(a)(2), the government must prove that the defendant (1) was released on bond; (2) was ordered to surrender for service of a sentence pursuant to a court order; (3) was aware that he or she was required to surrender for service of a sentence; (4) failed to surrender as required; and (5) was wilful in his or her failure to surrender. *See United States*

---

[3] (...continued)
ment's only evidence of wilfulness, as we discuss below. In any event, undeveloped and unsupported arguments may be deemed waived. *United States v. Thornton*, 642 F.3d 599, 606 (7th Cir. 2011); *United States v. Tockes*, 530 F.3d 628, 633 (7th Cir. 2008). We therefore will not address this skeletal argument further.

*v. Lechuga*, 975 F.2d 397, 400 (7th Cir. 1992) (setting forth the elements for a violation of section 3146(a)(1)). McIntosh disputes only whether the government met its burden on the element of wilfulness.

According to McIntosh, the government never proved to the court the location or date for his surrender. He complains that the government ignored the December 21, 2009 Order and relied on the November 25, 2009 Order instead. Because the later Order did not designate a specific time or place for his surrender, he contends that his failure to surrender could not have been wilful. Nor could the offense be characterized as "continuing," he asserts, when there was no specific time or place designated for his surrender. Moreover, McIntosh contends that the government's only evidence on wilfulness—testimony by a U.S. Marshal that his apartment appeared empty and abandoned—was contradicted by another U.S. Marshal and by his landlord, who testified that there were some belongings present in the apartment. Finally, because he received no letter from the BOP designating an institution, he maintains a conviction for failure to surrender cannot stand.

McIntosh's argument presumes that when the district court granted his motion to self-report to a designated institution, the December 21, 2009 Order granting that request somehow overrode the January 8, 2010 date for surrender that the court set in several previous orders. But nothing in the December 21, 2009 Order changed or vacated the expected date for surrender. Nor was there any doubt that McIntosh knew that the original

date held; on January 5, 2010, only three days before he was due to surrender, he filed a motion to stay the January 8, 2010 surrender date. On January 7, 2010, the court denied that motion. Although McIntosh now claims that his lawyer filed that motion without his knowledge, the court was certainly entitled to infer that McIntosh was aware of actions his attorney was taking on his behalf. But even if McIntosh was unaware of the motion to stay, the court had ordered a January 8, 2010 surrender date and no subsequent order had changed that date.

Moreover, even if McIntosh truly was confused by the December 21, 2009 Order regarding the time and place for his surrender, that confusion was soon resolved. McIntosh admitted at trial that within a few weeks after he failed to surrender, he became aware that the U.S. Marshals were looking for him. On January 29, 2010, he called the district court and was told by the court's staff that he was to surrender immediately to the U.S. Marshals because he had missed the January 8, 2010 date and a warrant had been issued for his arrest. As of that moment, if not sooner, he knew the specific time and place to surrender. Indeed, he admitted to a deputy U.S. Marshal in a subsequent phone call that day that he had spoken to the judge's staff and intended to turn himself in. Another deputy U.S. Marshal reinforced the court's message and told him to report to the lobby of the federal courthouse in Chicago at 8:30 a.m. on the next business day. McIntosh also called his attorney on January 29, and his attorney told him that his surrender date of January 8, 2010 had not changed. McIntosh did not, of course, report to the Mar-

shals the next business day. Instead, with full knowledge that he was already quite late for a mandatory appointment, McIntosh rented a car, loaded it with personal belongings, and drove to Nashville, Tennessee, where he remained until he was tracked down and arrested on February 3, 2010.

Contrary to McIntosh's claim, failure to surrender for service of a sentence is a continuing crime. *United States v. Elliott*, 467 F.3d 688, 690 (7th Cir. 2006) (concluding that failure to report for service of a sentence should be treated as a continuing offense in the same manner as escape, and disavowing *dicta* in *United States v. Knorr*, 942 F.2d 1217, 1223 (7th Cir. 1991), to the contrary). See also *United States v. Lopez*, 961 F.2d 1058, 1059-60 (2d Cir. 1992) (failure to appear for sentencing in violation of section 3146(a)(1) is a continuing offense); *United States v. Green*, 305 F.3d 422, 432-33 (6th Cir. 2002) (same); *United States v. Alcarez Camacho*, 340 F.3d 794, 796-97 (9th Cir. 2003) (failure to appear for trial in violation of section 3146(a)(1) is a continuing offense); *United States v. Martinez*, 890 F.2d 1088, 1091 (10th Cir. 1989) (failure to appear for service of a sentence in violation of section 3146(a)(2) is a continuing violation). Each day that he knowingly and wilfully continued to evade the service of his prison sentence violated the statute. Under any theory, as of January 29 at the very latest, McIntosh knew that the January 8, 2010 surrender date had not been vacated, and that the failure of the BOP to designate a particular institution did not relieve him of his obligation to surrender for the service of his sentence. As for the place to surrender, once again,

if he had any confusion prior to January 29, he could not claim ignorance after the court's staff and the deputy U.S. Marshal told him to surrender to the U.S. Marshals at the federal courthouse in Chicago where he had been sentenced. That he instead fled to another state in violation of the conditions of his probation demonstrated wilfulness in the evasion of serving his sentence. The government further proved his state of mind with evidence that McIntosh was found in possession of thirty-four fraudulent credit cards in Tennessee, an indicator that he had no intention of turning himself in any time soon. His admissions to the Secret Service agent who interviewed him after his arrest also demonstrated that McIntosh knew what was required of him and chose to flee the jurisdiction instead. In short, the evidence was more than adequate to support the element of wilfulness.

**B.**

The district court sentenced McIntosh to a term of five years' imprisonment for his violation of section 3146(a)(2). Section 3146(b) provides in relevant part:

(b) Punishment.--(1) The punishment for an offense under this section is--

(A) if the person was released in connection with a charge of, or while awaiting sentence, surrender for service of sentence, or appeal or certiorari after conviction for--

(i) an offense punishable by death, life imprisonment, or imprisonment for a term of 15 years or more, a fine under this title or imprisonment for not more than ten years, or both;

(ii) an offense punishable by imprisonment for a term of five years or more, a fine under this title or imprisonment for not more than five years, or both;

(iii) any other felony, a fine under this title or imprisonment for not more than two years, or both; or

(iv) a misdemeanor, a fine under this title or imprisonment for not more than one year, or both[.]

McIntosh contends that none of these provisions apply to him. Specifically, he argues that the sixteen-month sentence for which he failed to appear was imposed for a violation of supervised release, not for a "conviction." Because the statute does not prescribe a particular punishment for failure to surrender for a sentence imposed for a violation of supervised release, he reasons, "no punishment option exists for the offense."

We review questions of statutory interpretation *de novo*. *United States v. Thornton*, 539 F.3d 741, 745 (7th Cir. 2008). Although McIntosh characterizes the sixteen-month sentence as one imposed for a violation of supervised release, post-revocation penalties are attributed to the original conviction. *Johnson v. United States*, 529 U.S. 694, 700 (2000). *See also United States v. Wyatt*, 102 F.3d 241, 245 (7th Cir. 1996) (supervised release is a part of the defendant's original sentence, and it is the original sentence that is executed when the defendant is

returned to prison after a violation of the terms of his release). The original, underlying conviction that gave rise to the period of supervised release in this case was escape, which carries a maximum term of imprisonment of five years. *See* 18 U.S.C. § 751(a) ("[w]hoever escapes . . . from any institution or facility in which he is confined by direction of the Attorney General, or from any custody under or by virtue of any process issued under the laws of the United States by any court, judge, or magistrate judge . . . shall, if the custody or confinement is by virtue of an arrest on a charge of felony, or conviction of any offense, be fined under this title or imprisoned not more than five years, or both"). A straightforward application of section 3146(b)(1)(A)(ii) provides a maximum term of five years' imprisonment for McIntosh's failure to report for the service of the sentence imposed for violation of the term of supervised release, where that term of supervised release was imposed as part of a sentence for escape. The district court's five-year sentence was perfectly consistent with the statute, and McIntosh claims no other error in the sentence. The judgment of the district court is therefore

AFFIRMED.